UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
UNITED STATES OF AMERICA,

                Plaintiff,

- against -

ANTHONY ROMANELLO,
also known as "Rom,"

                Defendant.
------------------------------------------------x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y
★ JAN 04 2012 ★
BROOKLYN OFFICE

MEMORANDUM AND ORDER
10 CR 929(S-1) (ILG)

GLASSER, United States District Judge:

The government has moved this Court, *in limine*, for an order that would permit the receipt into evidence of excerpts of recordings consensually made by cooperating witness Michael D'Urso of conversations he had on March 22 and June 14, 2000, with Thomas Cafaro, an associate of the Genovese Crime Family. The essence of those conversations is fairly described as general chatter about various members, including the defendant, of the Genovese Crime Family.

## **Background**

The defendant was charged with Racketeering Conspiracy, 18 U.S.C. § 1962(d) in an indictment which alleged that the defendant "together with others, being a person employed by and associated with the Genovese crime family, an enterprise . . . did knowingly and intentionally conspire . . . to conduct and participate . . . in the conduct and affairs of that enterprise through a pattern of racketeering . . . . The defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise." The racketeering acts (RA) then alleged were: RA One - Extortionate Collection of Credit conspiracy which alleges that the defendant "together with others, did knowingly and intentionally conspire to participate in the use

of extortionate means to collect an extension of credit from John Doe #1 . . . .; RA Two - Illegal Gambling; RA Three - Extortion Conspiracy alleging in substance that the defendant and others agreed to obtain property by compelling John Doe #2 to deliver such property by instilling in him a fear that if the property were not delivered, the defendant and others would cause physical injury to him.[1]

The intercepted conversations of Cafaro which are sought to be introduced in evidence are set out in full:

### The March 22, 2000 conversation:

Thomas Cafaro = Cafaro; Michael D'Urso = CW

CW: Let's just hope your friend don't leave, gonna be there.

CAFARO: Me, I believe, it's his if he wants it. And that's how I-

CW: He might not want it. But then again you know what, he's not gonna turn away because he ain't gonna subject himself to have listen to all of these fuckin' idiots - after what he knows what's right and wrong.

CAFARO: Well - then he may leave somebody there and talk to them.

CW: Right.

CAFARO: Like everybody else did.

CW: He can't leave his guys.

CAFARO: No.

CW: We'd all be running for the hills. [Pause]. See I didn't think there was any of that.

CAFARO: I can't believe they didn't make, when he had his, when he

---

[1] It should be noted that the indictment in this RA alleges that the parties <u>agreed</u>, rather than <u>conspired</u> to extort John Doe #2.

went in for the surgery and when he had the heat, I'm surprised they didn't pull him out then.

CW: Who's gonna pull him out? Who's gonna pull him?

CAFARO: [U/I]

CW: You gotta be around to actually do something like that, I mean? You know what's gonna happen?

CAFARO: How'd they put him in?

CW: What? You don't think your friend put him there?

CAFARO: Well, so they send him word. [U/I] put somebody else, who do you want?

CW: Yeah who do you want? Who's gonna take it? Who's gonna take it?

CAFARO: Somebody will do him a favor if they ask him.

CW: Chuck don't want it.

CAFARO: If the other guy asked him.

CW: You know fuckin' Dom don't want it.

CAFARO: No - but I said, uh.

CW: Ernie will take it.

CAFARO: Yeah. What do you call it?

CW: He wouldn't be bad there.

CAFARO: No -

CW: from what I hear about him.

CAFARO: You know who would have been good too, but he don't want it? Is Tony from Corona.

CW: Oh, he don't want it either?

CAFARO: Nah. He has a ton of money.

3

CW: Uh, forget it. [U/I] close with Mickey all these years. They use excuses. I gotta take care of Mickey, I gotta do this.

CAFARO: He would have been good.

CW: You know him good?

CAFARO: Yeah.

CW: He's respected.

CAFARO: Patty knows him well.

CW: He's acting right now?

CAFARO: Him? No. He walked. He gave everything up.

CW: He's still a skipper, huh?

CAFARO: He gave, he gave that up.

CW: Who the fuck do they?

CAFARO: They got his guy out there. Tommy Z's cousin stays with him.

CW: Rom?

CAFARO: Yeah.

CW: They put Rom there?

CAFARO: Yeah.

CW: Come on?

CAFARO: That's what I heard.

CW: He finished [U/I]

CAFARO: Yeah.

CW: [U/I]

CAFARO: Well, yeah, exactly. But still, you know.

4

CW: Listen, everybody uses scapegoats, let's be realistic. But I don't agree with that, I gotta tell you the truth. I mean it works, but I don't agree with it.

CAFARO: Let me tell you something. He gave up all of his business. He gave up his bookmaking, shylocking, everything. He gave it to Rom. He gave it to him.

CW: Really?

CAFARO: He's so wealthy, real estate wise. He's got buildings; he's got property; he's got the restaurant. What the fuck does he need? And he's smart.

CW: You can't forget how you got it.

CAFARO: Well, I'm sure he does what he has to do for the old timers.

CW: Well, take a guy like that. Don't they take that as an insult that he doesn't want it? If you're needed, you're needed.

CAFARO: You don't know how he told him. We don't know what he told him. He may have had a legitimate you know?

CW: Sometimes you've gotta help this thing. Not everyone can run away from it. You gonna run away from it then hang your thing up and take it on the hop.

CAFARO: What I'm saying is, he may have said, I've got to do certain things, you know?

CAFARO: You wanna know something?

CW: [U/I] everything

CAFARO: Smart guys, you don't want them taking that position because eventually they get, they go and what are you gonna have? You see what's happening in all the other crews. They got amateurs.

CW: Yup. People gotta stay behind the scenes a little bit.

CAFARO: Oh, without a doubt. That's why all those years, nobody knew who Ben was. See, nobody knew who he was.

CW: No, huh.

5

CAFARO: Nobody.

CW: See Joe, Joe never wanted it.

CAFARO: Yeah?

CW: He said, I've got everyone's ear, what do I need it for?

CAFARO: Well, that's the same thing I'm saying. What do I need anything for? I just hang out with our friends.

CAFARO: Our friend, he's gonna look out for me.

CW: No doubt about it.

* * *

### The June 14, 2000 conversation:

Thomas Cafaro = Cafaro; Michael D'Urso = CW

CAFARO: I used to laugh because there's a guy Joe (IA) construction. He was very close to (UI). He used to tell him look you got this business, let's put Tommy there. (UI) he used to tell him, no, Tommy's alright he's got enough. I used to tell him, Pal, Something I know I'm doing, you know, that maybe I forgot?.

CW: Then what'd he say?

CAFARO: No, nothing. He said, "Don't worry about it." And that was it. You know, then he got pinched. The kid Nicky, that young kid. Ton of fucking money. Me and the Old Timer, that I was with that night, we shake our heads. We can't believe. He says all these pieces of shit, (UI) this guy the money.

CW: It's not good. People start saying, what the fuck, did they need it for?

CAFARO: Well, now hopefully, you know, when he comes homes we'll get a couple of things going. Who knows?

CW: Does the old timer [Chucky Tuzzo] down there see him? Does he go see him at all?

CAFARO: No he can't, he can't go see him. He would love to. Think that's why. I vote for him.

6

CW: Whose he answer to? Does he go see Tony too?

CAFARO: No, they see him.

CW: They see him?

CAFARO: No. They go see him, you know. He could have been there. He turned it down.

CW: He don't look like he, he wanted it anyway.

CAFARO: They wanted him for a while. They've been on... He used to be around Tony all the time, he's on a lot of tapes with Tony.

CW: He's no flashy guy either.

CAFARO: He used to be some fucking, you know—dapper

CW: Oh

CAFARO: He used to be, remember the old man Mickey, Generoso, Mickey Dimino?

CW: No.

CAFARO: That was the meeting with him. They used to come every day. I used to tell them, you look like the Bobsey twins.

CW: He's got cancer too.

CAFARO: You know, he stays behind the scenes. You know, tries to help him out. He was coaching him for a while, you know. If he would have listened, if Farby would have listened to him, he would never had a problem.

CW: With what?

CAFARO: When he was going on meets and stuff, they were gonna set it up. We'll bring you. My guys will bring you. Three, four cars. One guy picked him up, bring him to another spot. You know, that's how that guy is. When you go to a meeting, you know, you gotta 7:00 appointment. They start out three in the afternoon.

CW: Whose this?

7

CAFARO: The old timer.

CW: Yeah.

CAFARO: Start out three in the afternoon. One guy picks him up, brings him here. He stays there. Then another guy takes him here. By the time he get's over there, he went from here to here to here to here to there. By then, they got to know if somebody's - you know. That's how he is. I never call him. We never talk to each other on the phone. I left him that night. He knows the next month I'll see him this date, at this time. If I'm not there, something's wrong.

CW: Well what if you got an emergency?

CAFARO: If I got one? Well, I call somebody. (UI) He's got no more beeper.

CW: Got a phone?

CAFARO: He's a hundred percent for our friend. A million percent for him.

[PAUSE]

CW: He's just a skipper right? He used to be a skipper right?

CAFARO: He's got a good.... They've got a good bunch of guys. They've got a solid...

CW: Who?

CAFARO: The old timer. He's got Tough Tony Corona.

CW: He's got em?

CAFARO: Rom

CAFARO: Yeah. They, you know. They're all with him. They've got Rom. They got Tough Tony, they got this kid Mikey the Blonde.

CW: Good guys?

CAFARO: Oh yea, They're smart. (UI)

CAFARO: I know Rom like that.

8

CW: Rom's alright.

CAFARO: I know him like that. I met him twice.

CW: He's at the fucking track everyday..

CAFARO: Tony came home from prison, wanted nothing to do with it anymore. He gave everything away. (UI) Property.

CW: Who does?

CAFARO: Tony

CW: Rom, Rom. He's a friendly guy, you know. He's just, he's not as polished as Tony is.

CAFARO: No. No, Can't compare them. Night and day, night and day.

CAFARO: See Tommy Z. You met Tommy Z, right? Tommy LaRusso's cousin.

CW: Right

CAFARO: That's how I met Tommy Z. I met him down at the El Dorado.

CW: Does Rom know Patty?

CAFARO: Patty used to go out there when my father was around. My father was close to him. Every Friday night, he used to go out.

CW: They must have just straightened Rom out the last....

CAFARO: No, for years.

CW: Tony needed that.

CAFARO: He could have had it.

CW: You can't fucking...

CAFARO: He could have had it. He didn't want it.

CAFARO: He turned it down.

CW: Know what's gonna happen, pretty soon, they're gonna start telling

>people you have to take it. Or otherwise...

CAFARO: Usually no one refuses it. Smart people refuse,

CW: You know what I mean?

CAFARO: Tony. They get along good. He does a lot for him. Helps him with his case. Helping him out.

CW: Tony's got a lot of (UI).

CAFARO: He loves that restaurant - I mean he really works there.

CW: Oh Yeah.

CAFARO: He fucking walks around. We were in there one night. He walked by the table. I mean, You know, he came to sit with us later on. Every fucking waiter, he kicked them in the leg because there was a chair backed up against the wall, and it was scratching the thing. He buys a certain kind of meat, i t's gotta be cut a certain way.

The government asserts, in support of its motion, that the excerpts of Cafaro's conversations are admissible either as declarations against penal interest pursuant to Fed. R. Evid. 804(b)(3) or as co-conspirator statements in furtherance of the conspiracy charged in Count One pursuant to Rule 801(d)(2)(E). In addition, it asserts Rules 401-403 are applicable in that the excerpts are relevant and their probative value outweighs any danger of unfair prejudice.

The relevance of those excepts, the government avers, inheres in the context and dimension they add to the proof of the conspiracy; to the better understanding it will enable the jury to have of the crime charged and to the proof they provide of "the activities, purposes and means of the charged enterprise and of the predicate racketeering acts that constitute a 'pattern of racketeering activity.'" Government's Memorandum (GM) Docket No. 24 at p. 6. They are also relevant in corroborating

10

D'Urso's testimony that the defendant assisted in collecting the gambling debts alleged in RA One and that he operated a gambling business as alleged in RA Two.

### Penal Interest

The proffered excerpts are not hearsay, the government contends. Cafaro's statements are not, because having advised that he will claim his Fifth Amendment privilege if called to testify, he is deemed unavailable and because his "statements to D'Urso regarding his intimate knowledge of the structure and hierarchy of the Genovese crime family and the particular activities in which certain members are involved are plainly statements against Cafaro's penal interest." GM at 9. D'Urso is not mentioned under this rubric.

### Co-Conspirator's Statements

The government advances the admissibility of the excerpts on the following grounds: Cafaro's statements are in furtherance of the Genovese crime family conspiracy in that they were made to apprise D'Urso of the status of the conspiracy, to enlighten him as to the structure of the Genovese family, so that having been proposed for membership in that family, he would be aware of how he should conduct himself towards family Captains and not jeopardize his anticipated membership. GM 11-12.

## **Discussion**

The Court has read and re-read the text of those consensual recordings and lingered between the lines perhaps to divine in that space the "pertinent details that will enable" me and perhaps the jury "to better understand the charged crime" and enlighten me of "the activities, purpose and means of the charged enterprise." I was neither enlightened nor even better informed of the "activities, purpose and means of the

11

charged enterprise" and neither will the jury be. GM at 6. Those excerpts can add nothing to the first 12 paragraphs of the indictment which, in lucid detail describe the "enterprise" alleged to be the "Genovese organized crime family of La Cosa Nostra" and the five organized crime families embraced by that term. The structure of the Genovese family, its hierarchy, its administration, the prerequisites of membership and the means and methods of the enterprise are fully described and will be read to the jury. The probative value, if any, of those excerpts, is questionable. They would needlessly consume time and determining that Cafaro's statements are inadmissible hearsay, the balancing Fed. R. Evid. 401 and 403 that would otherwise be required is superfluous.

I turn first to Cafaro's statements as declarations against penal interest. Fed. R. Evid. 804(b)(3) provides that a hearsay exception is accorded to a statement that a reasonable person in Cafaro's position would have made if he believed it to be true because when he made it it would expose him to criminal liability. As has been noted above, the government regards "Cafaro's statements to D'Urso regarding his intimate knowledge of the structure and hierarchy of the Genovese Crime Family and the particular illegal activities in which certain members are involved as against his penal interest." GM at 9-10. There is no section in Title 18 of the United States Code of which I am aware which is offended by mere knowledge. The government does not allege that Cafaro was a member of the Genovese family, GM at 4, but even if he were, "mere membership in an organized crime organization is not a RICO offense" United States v. Bonanno Organized Crime Family, 683 F. Supp. 1411, 1429 (E.D.N.Y. 1988), or any other crime, Rastello v. Warden, Metropolitan Correctional Center, New York, et al., 622 F. Supp. 1387 (S.D.N.Y. 1985). In that case, Rastello was charged with violating the

12

terms of his parole by associating with persons engaged in criminal activity. At the revocation hearing, the only evidence offered to support that charge was testimony by an FBI agent that the persons involved were members of an organized crime family. In vacating the revocation of Rastello's parole, issuing the writ of habeas corpus and directing his release, Judge Weinfeld wrote at p. 1394:

> "... at oral argument before the court on the present motion, the government took the position that membership in a criminal organization, without more, is criminal activity within the meaning of the Parole Commission's regulations. While the Commission's interpretation of its own regulations are entitled to deference unless clearly unreasonable, the Commission has offered no justification for its view that a finding of criminal activity may be predicated upon a mere showing of membership in an organization believed by enforcement authorities to be engaged in a criminal enterprise...."

I am not aware of any section in Title 18 of the United States Code which makes mere membership in such an organization a crime. There is thus no basis to posit a reasonable person's belief that statements such as those made by Cafaro would subject him to criminal liability. The government's confidently asserted contention that "Cafaro's statements to D'Urso regarding his intimate knowledge of the structure and hierarchy of the Genovese crime family and the particular illegal activities in which certain members are involved are plainly statements against Cafaro's penal interest," GM at 9-10, is "plainly" an ipse dixit. That "intimate knowledge" is not vouchsafed to the likes of Cafaro, but is comprehensively retold in the first eleven paragraphs of this indictment and by knowledgeable witnesses in countless cases in which organized crime families were on trial. See, e.g., United States v. Gigante, 766 F.3d 75, 79 (2d Cir. 1999).

I turn to the government's assertion that Cafaro's conversations with D'Urso are

13

admissible pursuant to the co-conspirator exception to the hearsay rule created by Fed. R. Evid. 801(d)(2)(E), which provides that:

> "A statement is not hearsay if – the statement is offered against a party and is a statement by a co-conspirator or a party during the course and in furtherance of the conspiracy . . . ."

The government correctly states that admissibility pursuant to Rule 801(d)(2)(E) requires the court's finding by a preponderance of the evidence that a conspiracy existed, the membership of which included the declarant and the defendant and that the statement was made during the course of and in furtherance of the conspiracy. GM at 10. <u>Gigante</u>, *supra*, at 82.

It is important to bear in mind that "a conspiracy existed" only if the Court finds by a preponderance of the evidence that there was an <u>agreement</u> between the defendant and the declarant to commit a crime. The conversations between Cafarro and D'Urso can be minutely parsed and read into every vague and ambiguous allusion may be any meaning or intended meaning the imagination can construct without finding any suggestion, let alone evidence, of an agreement between the declarant, Cafaro and the defendant Romanello, the "party" against whom the statement is sought to be offered, about anything, let alone the commission of a crime. A conspiracy in the air, so to speak, will not do. A recognition of that ethereal deficiency was acknowledged in <u>Gigante</u>, *supra*, at 82-83, where the Court wrote:

> However, even in the context of organized crime, there is a limit to the proper use of 801(d)(2)(E) to admit co-conspirator testimony. The district court in each instance must find the existence of a specific criminal conspiracy beyond the general existence of the Mafia . . . .

14

> Early in Gigante's trial, Judge Weinstein announced his
> finding that 'there is a general overriding conspiracy among
> all of these alleged Mafia groups.' He then admitted some
> evidence under Rule 801(d)(2)(E) based solely on this
> finding of a general conspiracy. This was error. The district
> court's rationale would allow the admission of any statement
> by any member of the Mafia regarding any criminal behavior
> of any other member of the Mafia . . . .

The essential prerequisite, the sine qua non of a conspiracy, the existence of an agreement between the defendant and a declarant is infrequently accounted for in applying 801(d)(2)(E) particularly in Mafia cases. The indispensability of that prerequisite was accounted for although not precisely articulated in United States v. Russo, 302 F.3d 37, 44 (2d Cir. 2002), upon which the government principally relies, where the Court wrote, quoting from Gigante:

> Where evidence is offered against a defendant consisting of a
> declaration of an alleged co-conspirator in furtherance of
> some criminal act . . . the court 'in each instance must find
> the existence [between the defendant and the declarant] of a
> specific criminal conspiracy [to do the criminal act].'. . . The
> 'general existence of the Mafia' does not suffice. . . . This [is]
> unacceptable when the speaker and the defendant were not
> jointly engaged in the criminal venture that was being
> advanced by the speaker.

The "existence of a specific criminal conspiracy" can only be read to mean an agreement to commit the crime – "to do the criminal act" – a recognition of the essential prerequisite of a conspiracy. That reading is made manifest by the Court's affirmation of its observation in Gigante that the "general existence of the Mafia" is an unacceptable basis for applying 801(d)(2)(E) "when the speaker and the defendant were not jointly engaged in the criminal venture that was being advanced by the speaker." (emphasis added). A specific criminal conspiracy to do any criminal act between Romanello, the

15

defendant, and Cafaro, the delarant, does not exist.

The implicit recognition of the agreement that forms the core of a conspiracy is stated again in <u>Russo</u>, at 45 as follows:

> Thus when two people <u>enter into a joint venture of conspiratorial nature</u>, the actions and utterances of either done in furtherance of that conspiracy are deemed authorized by the other. Where one is a defendant, the declarations of his co-conspirator done in furtherance of the conspiracy formed between them are deemed to be authorized by the defendant and are admissible against him. (emphasis added).

It is the joint venture of the conspiracy which explains and makes meaningful the "agency" analogy the government seizes upon in support of the admissibility of Cafaro's statements. As has already been discussed, there was no "agency" between Cafaro and Romanello.

A reading of the facts in <u>Russo</u> clearly reveals that "both Russo and Hickey were <u>involved in a plan</u> to keep [Castranova] concealed from the FBI." 301 F.3d at 41, which led the Court to hold the applicability of 801(d)(2)(E) given that "the defendant and the declarant were involved together in a conspiracy to maintain an organized crime syndicate and the declarant's statement furthered the maintenance of the syndicate by giving associated persons information about its membership." 301 F.3d at 46.

There isn't a jot or a tittle in the transcripts that would permit even an inference of an explicit or implicit agreement of any kind between Romanello and Cafaro or Cafaro and D'Urso. They were simply not co-conspirators and nothing said by Cafaro in the proferred conversations was said in the course of or in furtherance of any conspiracy. The "error" of allowing "the admission of any statement by any member of the Mafia

16

regarding the criminal behavior of any other member of the Mafia" is committed again by the government in its assertion that "the first requirement [the conspiracy's existence] is satisfied because the defendant and the declarant (Thomas Cafaro) were members of a conspiracy, namely the Genovese crime family." GM at 11.[2]

The admissibility of Cafaro's statements resting entirely on the exceptions to the hearsay rule 804(b)(3) and 801(d)(2)(E) and neither being applicable, the government's motion to admit them is denied.

SO ORDERED.

Dated:    Brooklyn, New York
              January 3, 2012

S/ILG

I. Leo Glasser

---

[2] That statement is at odds with the government's earlier statements that "Cafaro was not himself a member of the Genovese crime family" and that "The government anticipates that "D'Urso will testify that at the time Cafaro made these statements to him, D'Urso was proposed for membership in the Genovese crime family." GM at 4-5.

17